IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION


LARRY BRADDOCK                                                    PLAINTIFF

VS.                                       CIVIL ACTION NO.  2:05CV2082KS-MTP

BAKER HUGHES INCORPORATED
LONG TERM DISABILITY PLAN AND
HARTFORD LIFE GROUP INSURANCE COMPANY                    DEFENDANTS


## MEMORANDUM OPINION AND ORDER

This cause is before the court on a motion for summary judgment filed by defendants

Baker Hughes Incorporated Long Term Disability Plan and Hartford Life Group Insurance

Company, and on a motion for summary judgment filed by plaintiff Larry Braddock.  From its

review of all matters made a part of the record of this case as well as applicable law, and being

thus fully advised in the premises, the court FINDS that defendants' motion for summary

judgment is well taken and should be granted and plaintiff's motion for summary judgment is not

well taken and should be denied.  The court specifically finds as follows:

### FACTUAL BACKGROUND[i]

_____

[i] These facts are taken from the Policy, duly authenticated by the Declaration of Shelley
W. Smith and from Mr. Braddock's claim file, duly authenticated by the Declaration of Nancy
Deskins (both exhibits to defendants' motion for summary judgment).  Plaintiff argues that
because Ms. Smith's Declaration is not a part of the claim file, it should not be considered by this
court.  However, Ms. Smith's Declaration was submitted by defendants in order to authenticate
the Plan documents, show the relationship, duties and responsibilities of Hartford and Baker
Hughes and to establish that the Plan is governed by ERISA.  This court is allowed to consider
Ms. Smith's Declaration for those purposes.  _See Albert v. Life Ins. Co._, 2005 U.S. App. LEXIS
26457, at * 10-12 (5th Cir. Dec. 2, 2005) (court can go beyond administrative record in
determining appropriate standard of review under ERISA); _Vega v. Nat'l Life Ins. Servs., Inc._,

1

Mr. Braddock was employed by Baker Hughes, Inc. ("Baker Hughes") as a salesman in its Baker Petrolite division in Laurel, Mississippi, from May 10, 1991 until August 22, 1997, when he went on medical leave. Baker Hughes provided long-term disability benefits to its employees, including Mr. Braddock, under the Baker Hughes Disability Benefits Plan, which incorporates the Baker Hughes Long Term Disability Plan as amended and restated on February 28, 1997 (the "Plan").

The Plan provides that long-term disability benefits will be paid to participants determined by the Plan Administrator to have a Total Disability. "Total Disability," for the purposes of long-term disability coverage, is defined as:

> a Disability[2] (i) which prevents a Long Term Disability
> Participant from engaging in any occupation or
> employment for which he is qualified, or may
> reasonably become qualified, based on his training,
> education, or experience, (ii) for which the Long Term
> Disability Participant is under the regular care and
> personal attendance of a Physician for treatment
> aimed at maximizing such Participant's recovery and
> return to work, and (iii) during which the Long Term
> Disability Participant does not engage in any occupation
> or perform any work for compensation or profit other
> than Rehabilitative Employment; provided, however, that
> during the first 12 months of a Disability, Total Disability
> means a Disability which prevents a Long Term Disability
> Participant from engaging in his regular occupation and
> which meets the foregoing requirements under clauses (ii)
> and (iii). Notwithstanding the foregoing, no Disability
> shall constitute a Total Disability unless the foregoing

188 F.3d 287, 300 (5th Cir. 1999) (court may not consider evidence outside administrative record "to resolve factual disputes with respect to the *merits* of the [ERISA] claim") (emphasis added).

[2] "Disability" is defined as "any impairment to the body that renders an individual wholly and continuously disabled and which is caused by sickness, pregnancy...or accidental bodily injury."

2

> conditions are met for the first time with respect to such
> Disability at a date upon which such individual is a Long
> Term Disability Participant in the Plan.

After the first twelve months, a participant is not eligible for long-term disability benefits if he is able to engage in any occupation or employment for which he is "qualified, or may reasonably become qualified, based on his training, education or experience."  The Plan further provides that "[a]s a condition to the payment of any benefits under the Plan, each Participant shall be required to provide proof of continued Total Disability, including, but not limited to, an examination by a Physician selected by the Plan Administrator, as may be required from time to time by the Plan Administrator."

Baker Hughes is the Plan Administrator and Sponsor of the Plan.  Baker Hughes performs certain administrative functions in connection with the Plan and has the right to terminate or modify the Plan.  Under the Plan, defendant Hartford Life Group Insurance Company ("Hartford") is the Claims Administrator and is responsible for processing and paying eligible claims.   Hartford has sole discretionary authority to determine eligibility for and entitlement to benefits under the Plan and to interpret the terms of the Plan.[3]

On August 6, 1997, Mr. Braddock saw his treating orthopedist, Dr. Richard Conn, who wrote in a report of that visit: "It is my medical opinion that this gentleman is suffering from his systemic rheumatologic condition to the point that he would be unable to continue to stand for any long periods of time and any squatting, crawling or climbing would be out of the question.  I

_____

[3] Until December 1, 2002, the Plan was self-insured by Baker Hughes and Reliastar was the Claims Administrator.  Thereafter, under a claim assumption agreement negotiated between Continental Casualty Company ("Continental") and Baker Hughes, dated December 1, 2002, Continental agreed to assume the liabilities of the Plan for Baker Hughes employees who terminated employment prior to December 1, 2002.  Hartford is a successor to Continental.

3

feel this is going to be on a permanent basis." On August 23, 1997, Mr. Braddock submitted a claim to Reliastar for disability benefits.

On a November 12, 1997 Attending Physician's Statement of Disability, Dr. Conn checked the box indicating that Mr. Braddock was totally disabled from any occupation and from his regular occupation. Again, on January 30, 1998, Dr. Conn checked the box indicating that Mr. Braddock was "totally disabled for any occupation." Mr. Braddock saw Dr. Conn again on March 5, 1998, and Dr. Conn wrote of this visit: "It is my opinion that this gentleman's ongoing arthritic conditions with his knees and ankle are on a permanent basis. I see no resolution at this time, and feel that this will be on a chronic ongoing basis." Dr. Conn also wrote on a Physical Capacities Evaluation: "Pt is unable to work!!!"

On March 3, 1998 Reliastar approved Mr. Braddock's claim for long-term disability benefits, effective February 28, 1998.

Thereafter, on October 2, 1998, Reliastar referred Mr. Braddock's file to EvaluMed for review by either an orthopedic surgeon or rheumatologist, to determine whether Mr. Braddock was capable of work at that time. Dr. Mark Dahl reviewed Mr. Braddock's medical records and in a report dated October 14, 1998, concluded that Mr. Braddock "should be capable of doing sedentary work." Dr. Dahl also recommended that Mr. Braddock receive an independent medical evaluation by a rheumatologist to evaluate his work capacity. Reliastar then arranged for Mr. Braddock to be evaluated by Dr. John Churchill Huntwork, a Rheumatologist. Dr. Huntwork completed an Independent Medical Evaluation, dated December 8, 1998, in which he generally concurred with the previous diagnoses of inflammatory arthritis and concluded that Mr. Braddock could engage in work activity of an "entirely sedentary nature involving lifting of no

4

more than 25 pounds, freedom of movement, a flexible schedule, no prolonged sitting and no climbing, stooping, crawling, kneeling, pushing or pulling whatsoever."

On January 6, 1999, Reliastar wrote to Dr. Conn enclosing Dr. Huntwork's report and asking if he agreed with Dr. Huntwork's assessment that Mr. Braddock could work in a sedentary capacity.  Dr. Conn signed the letter indicating his approval on February 2, 1999 and returned it to Reliastar.  Mr. Braddock was then referred to Robin Burris-Thomas, a Rehabilitation Coordinator, for a vocational assessment.  On February 22, 1999, Ms. Thomas interviewed Mr. Braddock and completed a Rehabilitation Report.  In her report, Ms. Thomas noted that Mr. Braddock stated that his pain was 7.5-8 on a scale of 0 to 10, and he estimated that he could sit for 30-40 minutes, stand for 20-30 minutes and drive for 15-20 minutes.  On May 18, 1999, Reliastar wrote to Mr. Braddock informing him that Ms. Thomas had explored vocational alternatives that existed within his physical limitations but that based upon review of this information, "it does not appear that vocational rehabilitation services are appropriate."  Reliastar informed Mr. Braddock that it would be transferring his claim to a Social Security Disability Benefit Specialist to review the appropriateness of applying for SSDI benefits."[4]

In a November 9, 1999 Medical Assessment, Dr. Conn stated that Mr. Braddock suffered

---

[4] On August 16, 1999, with assistance from Reliastar, Mr. Braddock filed an application with the Social Security Administration ("SSA") for social security disability benefits.  That application was initially denied on March 3, 2000 and was denied again on reconsideration in April 2000, because the SSA found that Mr. Braddock was not "disabled" within the meaning of the Social Security Act.  Mr. Braddock then filed a request for hearing before an administrative law judge on July 18, 2000.  A hearing was held on November 13, 2000.  On January 22, 2001, the SSA issued a decision that Mr. Braddock was not disabled.  Mr. Braddock filed a request for review by the Appeals Council, who then issued an order remanding the matter with instructions to allo Mr. Braddock to submit additional evidence.  A hearing was then held on September 26, 2001.  On October 26, 2001, the SSA issued a decision finding that Mr. Braddock had been disabled since April 10, 2000.

from degenerative arthritis and concluded: "Pt continues to have joint pain in both knees. And multiple joint pain and tenderness.  We see no resolution of this problem at this time."  And Dr. Conn noted after a September 20, 2000 visit with Mr. Braddock:  "The fact that these conditions are of a chronic and permanent nature relative to his ability to get about and the gentleman continues to be markedly restricted in terms of his activities with no crawling, climbing, limited to sitting and walking tolerance."

Plaintiff then submitted a Disability Claim Form to Hartford dated April 14, 2004 in which he stated that his activities were "very limited" and that he spent his time "either sitting, watching T.V. or reading."  Thereafter, in June 2004, Hartford referred Mr. Braddock's claim to the Special Investigation Unit ("SIU") for further investigation.  Hartford had become suspicious that Mr. Braddock might have been misrepresenting his disability because his self-reported restrictions and limitations seemed extreme when compared to his medical records.  SIU requested that HUB Enterprises conduct surveillance of Mr. Braddock.  Twenty hours of surveillance was then conducted on a consecutive Sunday and Monday, June 20 and 21, 2004.  A video was made of Mr. Braddock which, according to the November 5, 2004 summary prepared by HUB Enterprises, depicts him on the first day of surveillance standing and walking around his home in a normal manner without any restrictive movement or visible medical devices, and on the second day of surveillance, over nearly a three-hour period, driving from his house to a gas station, getting out of his car to pump gas, going into and out of the gas station, getting back into his car, driving to a store, going into and out of the store, getting back into his car, driving to a nursing home, going into and out of the nursing home twice, going to an investment and insurance company office and driving home.  During this trip, Mr. Braddock was not seen

6

wearing or using any medical devices and was seen walking in a normal manner, without any visible signs that he was in pain.[5]

On a July 1, 2004 Claimant Questionnaire submitted to Hartford, Mr. Braddock stated that his activities were severely limited, that he was in constant pain, that he was unable to sit or stand for any period of time and that riding in vehicles was extremely painful for him.  Hartford then requested medical records on July 22, 2004 from Mr. Braddock's treating orthopedic physicians, Dr. Conn and Dr. Susie Folse.

Mr. Braddock then saw Dr. Folse on August 9, 2004.  During that visit, Dr. Folse noted that Mr. Braddock "has increasing pain when he flexes or sits for any period of time" and she decided to put him on a lumbar support brace and prescribed additional Lortab for his pain.

On September 13, 2004, Hartford wrote to Dr. Folse and told her that based on its review of Mr. Braddock's medical records and the information provided by Dr. Folse and other doctors, it had concluded that Mr. Braddock "appears to have full-time sedentary capacity for employment.  Specifically, Mr. Braddock should be capable of sitting for 8 hours per day with allowances for periodic breaks and change of position every 2 hours."  Dr. Folse was asked to either sign the letter indicating her agreement with its opinion or, if she disagreed, to provide a response supported by specific medical information.  Dr. Folse signed the letter on September 23, 2004.

Hartford also wrote to Dr. Conn on September 13, 2004, informing him that it had reviewed Mr. Braddock's medical records and that based on the office visit dated April 14, 2004,

---

[5] Defendants submitted a copy of the surveillance video (on compact disc) to the court as an exhibit to their motion for summary judgment.  The court has reviewed this disc.

Hartford did not see that Dr. Conn had addressed Mr. Braddock's capacity to work.  Hartford

stated that "it does appear that Mr. Braddock should be capable of sitting for 8 hours per day with

allowances for periodic breaks and change of position every 2 hours."  Hartford requested that

Dr. Conn respond and provide input on Mr. Braddock's capacity to work.  Dr. Conn signed the

letter indicating his approval on September 29, 2004.

Mr. Braddock was interviewed in his home by Hartford Investigator Howard Spencer on

September 14, 2004.  At the interview, Mr. Braddock identified himself as the subject of the

surveillance video and agreed that it accurately depicted his level of functionality.  In his summary

of the interview, Mr. Spencer noted that during the interview, Mr. Braddock remained seated for

one hour and ten minutes until he was asked a question about sitting, at which point he rose and

stated that he needed to walk around and stretch his legs, as well as use the restroom.  Mr. Spencer

also noted that Mr. Braddock walked from the carport into the living room without complaining

of pain, although he did shuffle back and forth to the bathroom.  Mr. Spencer noted that Mr.

Braddock did not display any objective signs of pain during the interview, nor did he complain of

pain.  During the interview, Mr. Braddock gave a continuing disability statement in which he

stated that he suffers from chronic and severe back, shoulder knee and wrist/hand pain, that he

cannot stand, walk or sit for extended periods of time, that he cannot lift and carry anything of

significant weight, and that although he does not wear a back brace around the house, he wears it

when outside his home.

The next day, September 15, 2004, Hartford requested, and later received, records from

Mr. Braddock's physical therapy provider and from Mr. Braddock's family physician, Dr. Michael

May.  Hartford also requested further records from Drs. Conn and Folse.

On October 21, 2004, Hartford conducted an Employability Assessment Review in order to determine whether there were any sedentary occupations for which Mr. Braddock was qualified by education, training and experience.  Based upon Mr. Braddock's age, work history, education, geographic location and functionality, Tiffany Dyerson, M.S., C.R.C., determined that he could perform sedentary-level work as an account executive, sales manager or consultant.  Ms. Dyerson further found that these occupations "exist at a gainful wage in [Mr. Braddock's] geographical location."

Thereafter, on November 5, 2004, Hartford informed Mr. Braddock that he no longer met the definition of "Total Disability" and that therefore his benefits would be ending on November 27, 2004.  Hartford explained that it had based its decision on his medical record - specifically, on medical records from Drs. Folse and Conn, Dr. Dahl's Medical Records Review, Dr. Huntwork's Independent Medical Exam, records from Dr. May, surveillance of Mr. Braddock, the July 1, 2004 Claimant Questionnaire, physical therapy notes, the September 14, 2004 claimant interview, the September 23, 2004 letter from Dr. Folse and the September 29, 2004 letter from Dr. Conn.  Hartford stated that based on the information in his file, Mr. Braddock had the functionality to work either as an account executive, sales manager or consultant.

On November 17, 2004, after Mr. Braddock had received notice that his benefits would be terminated, Dr. Folse wrote a letter to Hartford in which she discussed Mr. Braddock's condition and stated that it continued to decline.  Dr. Folse also stated that Mr. Braddock was currently unemployable and would eventually require surgery in the future.

A vocational assessment dated November 27, 2004 by Kim Scheer determined that Mr. Braddock was not functionally impaired from performing alternative occupations such as those

9

described in the November 5, 2004 letter from Hartford- specifically, sedentary occupations or occupations requiring a low-level of physical functioning.

Hartford stopped paying long-term disability benefits to Mr. Braddock on November 27, 2004. Mr. Braddock wrote to Hartford on December 2, 2004 and responded to the November 5, 2004 letter as follows: 1) that Dr. Huntwork told Mr. Braddock that he could not sit for longer than thirty minutes at a time, that he would need to extend and elevate his legs at intervals during the day, and that he was not supposed to get up or down from a sitting position more than five times per day; 2) that he was not wearing a back brace on the surveillance tapes of June 20 and 21, 2004 because Dr. Folse did not prescribe a back brace until August 2004; 3) that it was not true that on June 21, he drove intermittently for 2 ½ hours as stated in Hartford's letter, but rather that he drove approximately 12 miles to the nursing home to visit his mother, that on the way he stopped and picked up cigarettes for his mother and also bought gasoline, that he was walking with a limp and holding his back, that he stayed at the nursing home for approximately 30 to 40 minutes, then drove back to Laurel to run an errand, and then he went home and stretched out the rest of the evening; 4) that during the interview he told Mr. Spencer that he did not wear his back brace at home because he was told not to lie down or sleep with it on, that 60-70% of his time is spent lying or reclining, that he did not sit consistently during the interview because he had to get up and get information for Mr. Spencer, that he got up to use the bathroom and get something to drink, and that during the interview he was sitting on the couch and was periodically elevating his legs on the couch to straighten them out; and 5) that the letter omitted that he has cervical spondylosis and idiopathic generalized neuropathy in both his hands and his feet.

Dr. Conn then wrote a letter to Mr. Braddock on January 5, 2005, stating: "Please note as

per the evaluation in November of my partner Dr. Susi Folse, it is apparent that you are preparing
to undergo major spinal surgical procedures.  It is my opinion that because of these major
procedures that you are confronted with that you are unable to work at this time, and there is no
anticipation of a return date at this moment.  Further evaluation would be required in the future to
make such determinations."

        As part of the appeals process, Hartford referred Mr. Braddock's claim to the University
Disability Consortium (UDC) to answer the question: "in your medical opinion, do the symptoms,
including pain, (to the extent these symptoms are consistent with the objective medical evidence),
support functional impairment that precludes the claimant from sedentary work? Or do the
medical reports support that claimant has a residual functional capacity for less than a sedentary
physical demand level?"  Mr. Braddock's file was reviewed by Dr. Carl W. Huff, Board Certified
in Orthopaedic Surgery, Preventive Medicine and Independent Medical Examiner with the UDC.
Dr. Huff reviewed various medical records from Mr. Braddock's file and completed a Medical
Record Review dated January 25, 2005.  In his Review, Dr. Huff concluded that although Mr.
Braddock "has conditions that will impair work in terms of ambulation and material handling...[i]t
is obvious from reviewing this man's medical records that he is very capable of sedentary
work...The concept that he is disabled for any occupation is ludicrous...There would be no barrier
for this patient to resume an occupation on a sedentary basis."

        On January 28, 2005, Hartford wrote to Mr. Braddock informing him that it had concluded
a review of his appeal and that the termination of his long-term disability claim was being upheld.
Hartford based its decision on the medical evidence in Mr. Braddock's file, including from Drs.
Folse and Conn, as well as Dr. Huff's report.  Mr. Braddock filed his Complaint in this action on

October 12, 2005,[6] seeking long-term disability benefits under the Plan, pursuant to the civil enforcement mechanism of ERISA, 29 U.S.C. § 1132.

SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is to be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrates the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Williams v. Adams*, 836 F.2d 958, 960 (5th Cir. 1988).  The moving party, however, need not negate the elements of the non-movant's case.  *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (*citing Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once the moving party satisfies its initial burden, the non-movant may not rest on the pleadings, but must "identify specific evidence in the ... record demonstrating that there is a material fact issue concerning the essential elements of its case."  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (citation omitted); *see also Celotex*, 477 U.S. at 322-23; *Anderson*, 477 U.S. at 257.  "The moving party need not support its motion with affidavits or other evidence, but to defeat a motion for summary judgment the nonmovant must present

---

[6] Originally, plaintiff sued The Baker Hughes Incorporated Long Term Disability Plan and The Hartford.  An Agreed Order was later entered substituting Hartford Life Group Insurance Company for The Hartford.

evidence sufficient to establish the existence of each element of his claim as to which he will have the burden of proof at trial." *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560, 565 (5th Cir. 1995) (citation omitted).

In analyzing a motion for summary judgment, all evidence must be "construed in the light most favorable to the nonmoving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir. 1996) (citation omitted).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor." *Palmer v. BRG, Inc.*, 498 U.S. 46, 49 n.5 (1990) (*quoting Anderson*, 477 U.S. at 255).  Nevertheless, "conclusory allegations, speculation and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *Douglass*, 79 F.3d at 1429 (citation omitted).  Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *See Celotex*, 477 U.S. at 322.  "In such situations, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23.

<u>ANALYSIS</u>

<u>Applicability of ERISA</u>

The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, exclusively governs (with certain exceptions not applicable here) "any employee benefit plan ... established or maintained ... by any employer engaged in commerce or in any industry affecting commerce."  29 U.S.C. § 1003; *see also Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 976 (5th Cir.

13

1991). An "employee welfare benefit plan"[7] is defined under ERISA as follows: "Any plan, fund or program ... established or maintained by an employer ... to the extent that such plan, fund or program was established or maintained by an employer ... for the purpose of providing to its participants or their beneficiaries ... benefits in the event of sickness, accident, disability, death or unemployment." 29 U.S.C. § 1002(1).

The Plan was established and maintained by plaintiff's employer, who is engaged in interstate commerce,[8] for the purpose of providing its employees benefits in the event of long-term disability. The Plan was established by Baker Hughes to provide certain health, disability and other welfare benefits to eligible employees. Further, the Plan provides: "It is the intention of the Company to establish hereby a program of benefits constituting an employee welfare plan within the meaning of section 3(1) of ERISA...." The Plan sets forth the benefits available, the intended participants and beneficiaries, and the appropriate procedures for submitting claims for benefits. The court finds (and the parties agree) that the Plan is an employee welfare benefit plan subject to ERISA. *See Meredith v. Time Ins. Co.*, 980 F.2d 352, 355 (5th Cir. 1993); *Hansen*, 940 F.2d at 977; *Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 240, 242 (5th Cir. 1990), *reh'g denied*, 1990 U.S. App. LEXIS 13227 (5th Cir. July 16, 1990); *Davis v. AIG Life Ins.*, 945 F.Supp. 961, 966 (S.D. Miss. 1995).

Where a participant seeks to recover benefits under an employee welfare benefit plan, the

---

[7] Under ERISA, the term "employee benefit plan" or "plan" means "an employee welfare benefit plan." 29 U.S.C. § 1002(3).

[8] Baker Hughes is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Texas. It furnishes worldwide oil and gas products and services, conducting operations and maintaining employees in several states - including Mississippi, where plaintiff was employed.

exclusive remedy is provided by ERISA's civil enforcement mechanism.  29 U.S.C. § 1132; *see also Hudson v. Aetna Ins. Co.*, 2006 WL 463129, at * 4 (S.D. Miss. Feb. 24, 2006) (*citing Hansen*, 904 F.2d at 979).  29 U.S.C. § 1132(a)(1)(B) provides that participant in a plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

Standard of Review Under ERISA

Where a "benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," this court is limited to reviewing its decisions to limit or deny benefits under an abuse of discretion standard, rather than *de novo*.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-15 (1989); *see also Albert v. Life Ins. Co.*, 2005 U.S. App. LEXIS 26457, at * 6-7 (5th Cir. Dec. 2, 2005) (citations omitted); *Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262, 269 (5th Cir. 2004); *cert. denied*, 545 U.S. 1128 (2005); *Vega v. Nat'l Life Ins. Serv., Inc.*, 188 F.3d 287, 295 (5th Cir. 1999).[9]  This standard of review applies to an initial denial of benefits as well as to a termination of benefits after an initial determination of eligibility.  *Matney v. Hartford Life & Accident Ins. Co.*, 172 Fed. Appx. 571, 572 (5th Cir. Mar. 27, 2006) (*citing Ellis*, 394 F.3d at 274).  The Plan gives Hartford sole discretionary authority to determine eligibility for and entitlement to benefits under the Plan and

---

[9] Although Baker Hughes is listed as the Plan Administrator, under the Policy Hartford, as Claims Administrator, is given sole discretionary authority to determine eligibility for and entitlement to benefits under the Plan and to interpret the terms of the Plan.  Therefore, Hartford is a "fiduciary" under ERISA because it is vested with "discretionary authority or discretionary responsibility in the administration of the plan."  *See* 29 U.S.C. § 1002(21)(A)(iii); *Ellis*, 294 F.3d at 266 n.3.  As a fiduciary vested with discretionary authority to determine eligibility for benefits under the Plan or to interpret the Plan's provisions, Hartford's determinations are reviewed under the abuse of discretion standard.  *Ellis*, 394 F.3d at 266 n.3, 269.

to interpret the terms of the Plan and any policy in connection with it, and therefore this court must apply an abuse of discretion standard in reviewing Hartford's decision to terminate Mr. Braddock's long-term disability benefits.

Under the abuse of discretion standard, the court must uphold the administrator's decision if it is supported by substantial evidence and is not arbitrary and capricious.  *Ellis*, 394 F.3d at 273; *Matney*, 172 Fed. Appx. at 572; *Albert*, 2005 U.S. App. LEXIS 26457, at * 7 (*citing Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.,* 168 F.3d 211, 215 (5th Cir. 1999)). "Substantial evidence" has been defined as "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ellis*, 394 F.3d at 269 (citations omitted).  In other words, the administrator's decision must "fall[ ] somewhere on a continuum of reasonableness–even if on the low end."  *Vega*, 188 F.3d at 297. Nevertheless, "[a]n administrator's decision to deny benefits must be 'based on evidence, even if disputable, that clearly supports the basis for its denial.'"  *Matney*, 172 Fed. Appx. at 572 (citations omitted); *see also Lewis v. Unum Life Ins. Co.*, 2006 U.S. App. LEXIS 17068, at * 10 (5th Cir. July 7, 2006).   "A decision is arbitrary if there is no rational connection between the known or found facts and the evidence in the record."  *Matney*, 172 Fed. Appx. at 572.[10]

Plaintiff has the burden of proving that Hartford's decision to terminate his long-term disability benefits constituted an abuse of discretion.  *Kirchenheuter v. Bd. of Trustees*, 341 F.Supp. 2d 624, 628 (S.D. Miss. 2004); *Haley v. Metro. Life Ins. Co.*, 189 F.Supp. 2d 567, 573

_____

[10] Plaintiff argues that any ambiguity regarding Mr. Braddock's entitlement to benefits should be resolved in favor of coverage.  However, this is not a correct statement of the standard of review.  "The law requires only that substantial evidence support a plan fiduciary's decisions...not that substantial evidence (or, for that matter, even a preponderance) exists to support the employee's claim of disability."  *Ellis*, 394 F.3d at 273 (citations omitted).

(S.D. Miss. 2001).  In applying the abuse of discretion standard, the court is limited to the administrative record which "consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it."  *Vega*, 188 F.3d at 300; *see also Matney,* 172 Fed. Appx. at 573; *Lewis v. CNA Group Life Assurance Co.*, 2006 U.S. Dist. LEXIS 25543, at * 4-5 (S.D. Miss. Feb. 7, 2006).

A potential conflict of interest is also a factor in the abuse of discretion inquiry. *Matney*, 172 Fed. Appx. at 572-73.  In this case, because Hartford insures the Plan and is also solely responsible for making benefits determinations, there is a potential conflict of interest because Hartford "potentially benefits from every denied claim."  *Ellis*, 188 F.3d at 295; *see also Unum*, 2006 U.S. App. LEXIS 17068, at * 6-7.  Therefore, the  court must apply a "sliding scale standard" in reviewing Hartford's decision, meaning that the court must "give[ ] less deference to the administrator in proportion to the administrator's apparent conflict," and is "less likely to make forgiving inferences when confronted with a record that arguably does not support the administrator's decision." *Vega*, 188 F.3d at 296, 299; *see also Matney*, 172 Fed. Appx. at 572-73.  However, as there is no other evidence of a conflict other than Hartford's position as the insurer and also as the one determining eligibility for benefits, the court will afford Hartford's decision "only a modicum less deference" than it would otherwise.  *Matney*, 172 Fed. Appx. at 573 (*citing Vega*, 188 F.3d at 301).

Application of Abuse of Discretion Standard

The court finds that Hartford's decision to terminate Mr. Braddock's benefits is supported by substantial evidence.  Although the court has already summarized the administrative record

earlier, a few things are worthy of note:  the June 20 and 21, 2004 surveillance of Mr. Braddock shows him walking, moving, driving, pumping gas and getting into and out of his automobile without apparent difficulty; Mr. Braddock did not exhibit signs of, nor complain of, any pain during the September 14, 2004 home interview and was able to sit for one hour and 15 minutes without getting up to stretch or shift positions; Drs. Folse and Conn, Mr. Braddock's treating orthopedic physicians, both agreed that Mr. Braddock could sit for 8 hours per day with allowances for periodic breaks and changes of position every 2 hour; Dr. Folse specifically agreed that Mr. Braddock was capable of doing full-time sedentary employment; Dr. Huff, who conducted an independent medical review, concluded that there was no reason why Mr. Braddock could not engage in a sedentary occupation; and Hartford's Employability Assessment Review concluded that Mr. Braddock was qualified to perform work in several sedentary-type occupations and that these occupations existed at a gainful wage in his geographical location.   Plaintiff makes several arguments in support of his motion for summary judgment and in opposition to defendants' motion for summary judgment.  Each will be addressed briefly below.

Plaintiff argues that Hartford's reliance on the September 23, 2004 letter from Dr. Folse and the September 29, 2004 letter from Conn, rather than their subsequent letters, constituted an abuse of discretion.  However, Hartford was entitled to rely on these physicians' original opinions in making its benefit determination, as there was no basis in the record to support a change in their opinions.  *See Gooden v. Provident Life & Accident Ins. Co.*, 250 F.3d 329, 333-34 (5th Cir. 2001) (finding that insurer did not abuse its discretion in failing to consider letter from plaintiff's physician stating he was disabled because letter was submitted after benefits were terminated and it contradicted pervious medical opinions by same physician); *Schultz v. Progressive Life, Health*

*& Disability Benefits Plan*, 380 F.Supp. 2d 780, 787 (S.D. Miss. 2005) (holding that administrator had no duty to credit conclusory and unsubstantiated letter regarding claimant's disability sent after initial denial of benefits); *CNA*, 2006 U.S. Dist. LEXIS 25543, at * 13 (finding administrator under no duty to consider unsupported conclusory opinion submitted after benefits initially denied).

Plaintiff also argues that Hartford should not have relied on the opinion of Dr. Huff, who did not personally examine Mr. Braddock.  However, the Supreme Court has held that under ERISA, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Indeed, numerous courts have upheld administrators' decisions where the administrator chose to rely upon medical opinions from doctors other than treating physicians, even from doctors selected by the administrator to review the claim and even where those doctors did not personally examine the claimant.  *See, e.g., Chandler v. Hartford Life*, 2006 WL 1209363, at * 4 (5th Cir. Apr. 28, 2006); *Vercher v. Alexander & Alexander, Inc.*, 379 F.3d 222, 231-33 (5th Cir. 2004); *Dubose v. Prudential Ins. Co.*, 85 Fed. Appx. 371, 372 (5th Cir. 2003); *Sweatman v. Comm'l Union Ins. Co.*, 39 F.3d 594, 602-03 (5th Cir. 1994); *Noble v. Ingalls Shipbuilding*, 2006 WL 839519, at * 4 (S.D. Miss. Mar. 29, 2006).

Plaintiff also disputes Hartford's interpretation of the surveillance video as well as the home interview.  However, this court cannot say that it was not reasonable for Hartford to conclude from the video and the interview that plaintiff did not demonstrate the physical

limitations and lack of functionality that would prevent him from performing a sedentary-level occupation, especially when viewed in light of the other evidence in the record.

Plaintiff takes issue with the fact that Hartford did not obtain any "outside and objective vocational reports" to support its conclusion that Mr. Braddock could perform work in various occupations.  However, in reaching its conclusion that Mr. Braddock could work as either an account executive, sales manager or consultant and that these jobs existed in his geographical area at a gainful wage, Hartford relied upon an Employability Assessment Report performed by Tiffany Dyenson, M.S., C.R.C.  This report shows that Mr. Braddock's age, prior work history, education, geographic location and functional capacity were considered in coming to the conclusion that he could perform these sedentary occupations. Moreover, given the evidence in the record and the "undemanding language" of the Plan, it was not an abuse of discretion for Hartford to not obtain the opinion of a vocational rehabilitation expert  *See Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1309 (5th Cir. 1994), *reh'g denied en banc*, 20 F.3d 471 (5th Cir. 1994) ( holding that plan administrator could determine disability without vocational testimony); *see also CNA*, 2006 U.S. Dist. LEXIS 25543, at * 15-16 (holding that administrator did not abuse its discretion by reasonably concluding "that sedentary jobs can be performed by an individual with a high school diploma and basic computer skills" without obtaining reports from vocational expert).

Plaintiff also argues that because Hartford has not shown that his condition has improved, its decision to discontinue benefits is an abuse of discretion and, in fact, it is estopped from denying benefits based on Reliastar's earlier finding of disability in 1998 and its statement to the

SSA in 2001 that Mr. Braddock was disabled.[11]  However, the Fifth Circuit has addressed this

very issue and rejected plaintiff's argument, holding that

> when a plan fiduciary initially determines that a covered
> employee is eligible for benefits and later determines that
> the employee is not, or has ceased to be, eligible for benefits
> by virtue of additional medical information received, the plan
> fiduciary is not required to obtain proof that a substantial change
> in the LTD recipient's medical condition occurred after the
> initial determination of eligibility ... A plan fiduciary that has
> granted plan benefits to a participant or beneficiary is not
> estopped from terminating those benefits merely because there
> is no evidence that a substantial change in the covered
> employee's medical condition occurred after the original grant
> of benefits.

*Ellis*, 394 F.3d at 274.  *See also CNA*, 2006 U.S. Dist. LEXIS 25543, at * 17 (stating that "it is not

incumbent on CNA to demonstrate that plaintiff's condition improved between the time his claim

for long-term disability benefits was approved and the time they were thereafter discontinued.

Rather, it need only appear from the record that at the time benefits were discontinued, the

evidence supported a conclusion that the plaintiff did not meet the policy definition of 'totally

disabled.'").  Thus, the only inquiry for this court is whether Hartford's decision that Mr.

Braddock was not disabled as of November 5, 2004 is supported by substantial evidence.

Plaintiff also complains that Hartford has not produced any claims manual, standards or

guidelines which provide insight into how decisions are made regarding disabilities such as

plaintiff's.  Such manuals, standards and guidelines are irrelevant.  The issue before this court is

---

[11] Plaintiff also speculates that the decision to terminate benefits is somehow related to
the replacement of Hartford as the Claims Administrator instead of Reliastar.  Plaintiff offers no
facts in support of this allegation, and as defendants point out, the change occurred in 2002, two
years before Mr. Braddock's benefits were terminated, which undercuts any connection between
the two events.

whether substantial evidence in the administrative record supports its decision to terminate benefits.

Finally, plaintiff argues that Hartford failed to take into consideration the SSA's October 2001 award to plaintiff of social security disability benefits.  However, Hartford was not required to defer to the SSA's decision, and was entitled to reach its own independent conclusion as to Mr. Braddock's eligibility for disability benefits, as long as that conclusion was based on substantial evidence.  *Dubose v. Prudential Ins. Co.*, 85 Fed. Appx. 371, 372 (5th Cir. Dec. 24, 2003) (*per curiam*); *CNA*, 2006 U.S. Dist. LEXIS 25543, at * 17 n.6; *Jones v. Lumberman's Mutual Cas. Co.*, 1995 WL 1945568, at * 8 (N.D. Miss. Mar. 1, 1995); *Freeman v. Sickness & Accident Disability Plan of AT&T Techs., Ins.*, 823 F.Supp. 404, 416 (S.D. Miss. 1993).  The question for this court is whether there is substantial evidence in the administrative record (which includes, but is certainly not limited to, the SSA decision) to support its decision to terminate Mr. Braddock's disability benefits.  That Hartford reached a different conclusion than the SSA does not mean that its decision was not reasonable.[12]

Plaintiff obviously disagrees with Hartford's decision to terminate his long-term disability benefits.  And the court notes that there is certainly room within the administrative record for a

---

[12] Moreover, the standards of review under the SSA rules and under ERISA are very different.  Under the SSA's rules, once it is found that a claimant cannot perform the duties of his past work due to his physical condition, "the burden shifts to the Social Security Administration to show that there are other jobs existing in significant numbers in the national economy that the claimant can perform, consistent with his residual functional capacity, age, education and work experience."  Under ERISA and under the Plan, however, claimant has the burden of showing entitlement to benefits under the Plan.  "That the Social Security Administration reached another conclusion, under another standard does not mean that the decision of the plan administrator here was incorrect or ill-considered under the standard which here applies."  *Freeman*, 823 F.Supp. at 416.

reasonable dispute about this.  However, it is not for this court to second-guess Hartford's

decision.  Rather, this court must defer to Hartford unless it abused its discretion or its decision is

not supported by substantial evidence.  As discussed above, the court finds that Hartford did not

abuse its discretion and its decision was supported by substantial evidence.

IT IS, THEREFORE, ORDERED AND ADJUDGED that defendants' motion for

summary judgment [**# 19**] is granted, plaintiff's motion for summary judgment [**# 23**] is denied,

and plaintiff's complaint is dismissed with prejudice.

SO ORDERED and ADJUDGED on this, the 30th day of October, 2006.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE